**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Case No. 14-cv-0707-WJM

In re:  CHAD DAVID GUBRATH and
        NICOLE DIANN GUBRATH,

   Debtors.

COLLEGE ASSIST, and
MRU STUDENT LOAN TRUST, 2007-A,

   Appellants,

v.

CHAD DAVID GUBRATH and
NICOLE DIANN GUBRATH,

   Appellees.

---

**ORDER AFFIRMING BANKRUPTCY COURT'S ORDER DISCHARGING
STUDENT LOAN DEBT**

---

College Assist and MRU Student Loan Trust, 2007-A ("Appellants") appeal from the Bankruptcy Court's March 10, 2014 Order discharging the student loan debts of debtors Chad and Nicole GuBrath ("the GuBraths" or "Debtors"). For the reasons set forth below, the Bankruptcy Court's Order is AFFIRMED.

**I. BACKGROUND**

In 2005-06, Debtor Chad GuBrath executed promissory notes in favor of Appellant MRU Student Loan Trust 2007-A in a total sum of $64,184.85. (ECF Nos.[1]

---

[1] References to the Record on Appeal, as filed with this Court, are cited as (ECF No. __.). References to filings on the Bankruptcy Court's Docket are cited as (Bankr. Docket No. __.).

16-11 & 16-12.)  Nicole GuBrath was a co-borrower on at least one of these loans. (ECF No. 16-12.)  Chad GuBrath also executed two promissory notes in favor of Appellant College Assist, which have a value of $64,162.95.  (ECF Nos. 16-25 & 16-27.) Nicole GuBrath executed a promissory note in favor of College Assist for $8,446.09. (ECF No. 16-28.)  In addition to these loans, the GuBraths obtained over $150,000 in additional student loans from other lenders.

After these loans went into repayment, Appellants allowed the GuBraths to make payments under income-based repayment plans, such that the GuBraths' monthly payments on these loans was between $0 and $30 per month.  (ECF Nos. 16-15 & 17.) Before seeking discharge of their student loan debt, Debtors made only five payments totaling $153 on the loans to Appellants.  (ECF No. 17 at 82.)  Other loans taken out by the GuBraths were not subject to income-based repayment plans and required payments of at least $377 per month, and these loans were in collection at the time of the proceedings before the Bankruptcy Court.  (ECF No. 17 at 129-130.)

On May 4, 2012, the Debtors filed for Chapter 7 bankruptcy, and listed a total of $340,297.85 in unsecured debt, with $282,421.25 in student loans.  (ECF Nos. 16-5 & 16-6.)  On February 14, 2013, Debtors brought an adversary proceeding, seeking discharge of their student loan debt.  (Bankr. Docket No. 1.)  A number of loan holders, including Sallie Mae, National Collegiate Trust, and the Education Resources Institute, did not respond to this adversarial proceeding, and default was entered against them. (Bankr. Docket Nos. 29-31.)  The only note holders who contested the adversarial proceeding were Appellants.  (*See generally* Bankr. Docket.)

Bankruptcy Judge Bruce Campbell presided over a one-day bench trial. (Bankr. Docket No. 92.) At trial, Chad and Nicole GuBrath testified about their financial situation, earning opportunities, and lifestyle. (ECF No. 17.) Their testimony shows that the GuBraths have one dependent, a 12-year-old son who suffers from anxiety reaction, epilepsy, intermittent explosive disorder, autism, and constipation. (*Id.* at 38-42, 142-45; ECF No. 16-4.) He is non-verbal, requires a special diet, and attends a specialized school program. (*Id.*) It is not anticipated that his condition is likely to significantly improve; rather, he will need intensive care for the rest of his life. (ECF No. 17 at 48-49, 146-47.)

With regard to income, Nicole GuBrath testified that, due to the need to care for her child, she has been unable to obtain paid employment. (ECF No. 17 at 48, 145-46.) She has pursued part-time work, but has been unsuccessful in finding a position that can accommodate her schedule. (*Id.*) Chad GuBrath works full-time as an investigator for the State of Colorado, where he nets $3,181.05 per month. (ECF No. 16-2.) Because he sometimes has to work weekends and evenings, he is unable to get a second job. (ECF No. 17 at 50.) Mr. GuBrath has received a number of raises this year, but does not anticipate this trend continuing. (*Id.* at 86-87.)

The Debtors also testified extensively about their monthly spending habits. They cancelled their cable and landline telephone, do their own home and auto repairs, and use coupons when possible. (ECF No. 17 at 64-65.) They do not vacation, get books and movies from the library, and minimize gift giving. (*Id.* at 65-66.) They have no credit cards, no savings, and receive no help from outside sources. (*Id.* at 51, 63-64.) However, the Debtors spend $130 per month on life insurance, have internet service in

their home, and have cell phones.  (*Id.* at 88.)  The Debtors spend about $1,000 a month on groceries, which far exceeds the guidelines put out by the United States Department of Agriculture for a family of three.  (*Id.* at 88-93.)  Debtors also spend about $150 a month eating out and $100 a month on liquor.  (ECF Nos. 16-42 & 16-43.)

On February 21, 2014, the Bankruptcy Court made its oral findings of fact and conclusions of law.  (Bankr. Docket No. 129.)  Judge Campbell found that Debtors had met their burden of showing that the Debtors' student loans constituted an undue hardship under 11 U.S.C. § 523(a)(8).  (*Id.* at 5.)  Based on this finding, the Bankruptcy Court ordered that the Debtors' student loans be discharged.  (*Id.* at 17.)  A subsequent order confirming the ruling was entered on March 10, 2014.  (Bankr. Docket No. 104.)

Appellants then filed the instant appeal.  (ECF No. 2.)  The opening brief was filed on May 27, 2014.  (ECF No. 15.)  The Debtors filed their response brief on June 5, 2014 (ECF No. 19), and Appellants filed their reply on June 24, 2014 (ECF No. 22).  The case is ripe for review.

## II.  LEGAL STANDARD

In reviewing a bankruptcy court's decision, the district court functions as an appellate court and is authorized to affirm, reverse, modify, or remand the bankruptcy court's ruling.  28 U.S.C. § 158(a); Fed. R. Bankr. P. 8013.  A bankruptcy court's legal conclusions are reviewed *de novo*, and factual findings are reviewed for clear error.  *In re Warren*, 512 F.3d 1241, 1248 (10th Cir. 2008).  In this case, the parties agree that the Court reviews the bankruptcy court's factual findings regarding Appellee's financial situation for clear error, and that the Court reviews *de novo* whether those findings constitute undue hardship pursuant to 11 U.S.C. § 523(a)(8).  *See Alderete v. Educ.*

*Credit Mgmt. Corp.*, 412 F.3d 1200, 1204 (10th Cir. 2005).

### III.  ANALYSIS

Section 523(a)(8) of the Bankruptcy Code states that a Chapter 7 discharge does not discharge an individual debtor from any debt "for an educational . . . loan made, insured or guaranteed by a governmental unit . . . unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependants[.]"  To determine what constitutes an "undue hardship", the Tenth Circuit has adopted the three-part test set forth in *Brunner v. New York State of Higher Education Services*, 831 F.2d 395 (2d Cir. 1987):

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependants if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Educational Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1305-06 (10th Cir. 2004). The Tenth Circuit explicitly eschewed formulaic application of this standard, instead imploring courts to "advance the Bankruptcy Code's 'fresh start' policy" and apply the *Brunner* test in a manner "such that debtors who truly cannot afford to repay their loans may have their loans discharged."  *Id.* at 1309.

The Bankruptcy Court discharged all of the Debtors' student loan debts based on its finding that the failure to discharge the student loan debts would impose an undue hardship on Debtors.  (R. 272.)  Appellants contend that a number of the factual findings underlying this conclusion were erroneous.  The Court will discuss Appellants' arguments in turn below.

5

**A.     Total Debt Owed by Debtors**

In its oral findings of fact and conclusions of law, the Bankruptcy Court noted that the GuBraths had incurred higher education debt in the amount of $295,392.83, which is accruing interest at a rate of approximately $15,000 per year. (Bankr. Docket No. 129 at 7.) It is undisputed that the amounts owed to Appellants are the only loans that were contested at trial, and that these loans totaled $137,284.85. (ECF No. 15 at 12.) Appellants contend that the Bankruptcy Court erred by referring to and relying on the uncontested loan amounts in making its *Brunner* findings. (*Id.* at 11-12.)

Having reviewed the record, the Court concludes that the Bankruptcy Court did not err in discussing the full amount of the GuBraths' student loan debt. "A factual finding is 'clearly erroneous' when 'it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made.'" *In re Lemke*, 423 B.R. 917, 919-20 (10th Cir. B.A.P. 2010) (quoting *Las Vegas Ice & Cold Storage Co. v. Far W. Bank*, 893 F.2d 1182, 1185 (10th Cir. 1990)). The Bankruptcy Court's statement regarding the total amount of debt owed by the GuBraths was factually accurate; it is undisputed that the GuBraths incurred $295,392.83 in student loan debt. At the time of the trial and the Court's ruling, even the uncontested loan amounts had not yet been discharged, which means that the GuBraths were still under their full debt burden.

Moreover, after stating that the GuBraths had incurred $295,392.83 in debt that was accruing interest at a rate of approximately $15,000 per year, the Bankruptcy Court explicitly stated that defaults had been entered against Sallie Mae and National Collegiate Trust, and that only the Appellants were contesting discharge of their loans.

6

(Bankr. Docket No. 129 at 7.) Thus, the Bankruptcy Court was plainly aware of the status of all of the loans at the time it made its *Brunner* findings.

As such, the Court finds that the Bankruptcy Court did not commit clear error in its findings regarding the amount of student loan debt owed by the GuBraths.

**B.**     ***Brunner* Factors**

Appellants take issue with a number of the factual findings made by the Bankruptcy Court with regard to the *Brunner* factors. (ECF No. 15 at 13-21.) The Court will address each factor below.

    1.     <u>Ability to Maintain Minimal Standard of Living</u>

Under the first prong, the Court must "evaluate the debtor's current financial situation" and "take into consideration whether the debtor has demonstrated any reason why he or she is unable to earn sufficient income to maintain him/herself and dependants while repaying the student loan debt." *In re Alderete*, 308 B.R. at 503. "A minimal standard of living includes what is minimally necessary to see that the needs of the debtor and [his] dependents are met for care, including food, shelter, clothing, and medical treatment." *In re Innes*, 284 F.R. 496, 504 (D. Kan. 2002). With regard to this inquiry, the Bankruptcy Court found as follows:

> [G]iven the health and disability challenges facing the GuBrath family, and given the enormity of the debtors' student loan debt combined with the Court's finding that the GuBraths are, under the circumstances, earning what they are able by working hard to support themselves without frivolous or luxury spending, the Court concludes that these debtors cannot maintain a minimal standard of living while at the same time repaying their student loan debt.

(Bankr. Docket No. 129 at 16.)

Appellants contend that this finding was erroneous and point to the fact that the GuBraths spend money each month on liquor and at restaurants. (ECF No. 15 at 14-15.) Appellants also take issue with the monthly amount allocated to groceries by the GuBraths. (*Id.* at 15-16.) Finally, Appellants point to decisions of other courts who have found that the debtors failed to satisfy the first prong when they had similar spending habits. (*Id.* at 17.)

The Court acknowledges that there is support in the record for each of Appellants' arguments. Were the Court considering this issue for the first time, it may have been inclined to side with Appellants and hold that the GuBraths had not shown that making payments on their student loans would make them unable to maintain a minimal standard of living. However, this Court reviews the Bankruptcy Court's findings under the very deferential standard of clear error. *In re Lemke*, 423 B.R. at 919-20. So long as there is support in the record for the Bankruptcy Court's finding, and the Court is not firmly convinced that a mistake has been made, the finding must be affirmed.

The Court concludes that there is sufficient support in the record for the Bankruptcy Court's finding that the GuBraths would not be able to maintain a minimal standard of living if forced to pay off their educational debt. The GuBraths explained how their money was allocated each month, testified about attempts to minimize their expenses, and put forth evidence showing that they were doing their best to live within their means. (ECF No. 12-1 at 238-42.) The GuBraths testified about their son's medical needs, including a special diet, and how these expenses cause them to spend more on groceries than a typical family their size. (*Id.*; ECF No. 17 at 131-32.) The record shows that there was no extra money at the end of each month, and that having

to make payments towards student loans of this size would interfere with their ability to maintain their standard of living. (*Id.*)

Appellants' argument regarding the monies spent by the GuBraths on "non-essential" commodities like restaurants and alcohol ignores the reality that, even putting these amounts aside, the record shows that Debtors could not come close to making the payments on the debt that had incurred. "The *Brunner* test ought not be turned in that fashion into a game of 'gotcha' based on viewing certain expenditures in isolation, wearing blinders that disregard the debtor's needs in a global fashion." *In re Zook*, 2009 WL 512436, at *9 (Bankr. D.D.C. Feb. 27, 2009). Moreover, "[e]ven under the minimal standard of living test, people must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet." *In re McLaney*, 375 B.R. 666, 674 (M.D. Ala. 2007).

The Court is also not persuaded by Appellants' citation to other courts that have held contrary to the Bankruptcy Court's findings here. Other judges' findings that a debtor could still make payments on educational debt and maintain a minimal standard of living under similar conditions does not mean that the Bankruptcy Court's contrary findings in this case were clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

As there is sufficient factual support in the record for the Bankruptcy Court's finding, the Court finds that Appellants have failed to show clear error as to the first prong of the *Brunner* test.

### 2. Persistence of Financial Condition

The second prong of the *Brunner* test looks at whether "additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." *Id.*, 831 F.2d at 396.  As described by one court, this prong of the test "imputes to the meaning of 'undue hardship' a requirement that the debtor show his dire financial condition is likely to exist for a significant portion of the repayment period."  *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993).

With regard to this prong, the Bankruptcy Court found that "the health and disability challenges facing these debtors and their son are severe and profound and the evidence establishes that this condition will likely persist for a significant portion of the repayment period of the debtors' student loans."  (Bankr. Docket No. 129 at 16.) Appellants contend that this finding was error because Chad GuBrath received a number of raises in the last year, and because Nicole GuBrath testified that she would like to return to work someday.  (ECF No. 15 at 19.)  Although these arguments are supported by the record, the Bankruptcy Court's findings also have significant support, and are therefore not clearly erroneous.

Chad GuBrath testified that he has received a number of raises in the past year, but that he does not anticipate receiving anything other than cost of living adjustments in the future.  Additionally, after one of these raises, his income increased to the point that the family is now disqualified from receiving a disability payment from the Social Security Administration for their son.  While Ms. GuBrath testified that she would like to return to work one day, she also discussed how difficult it would be for her to substantially contribute to the family's income given the intensive needs of her child.

The record shows that the GuBrath's son's medical condition is not likely to improve, and that he will need substantial care for the rest of his life. Given these facts, the Court concludes that the Bankruptcy Court did not err in finding that the Debtors had satisfied the second prong of the *Brunner* test.

### 3. Good Faith Effort to Pay Loans

The third prong of the *Brunner* test requires that trial courts consider whether the debtor has made a "good faith effort to repay" a student loan. *In re Alderete*, 308 B.R. at 504. The Bankruptcy Court found that borrowing nearly $300,000 for student loan "may have reflected bad judgment. However, bad judgment is not bad faith." (Bankr. Docket No. 129 at 16-17.) The Bankruptcy Court noted that the GuBraths had made some minimal payments on their loans, and found that they had made a good faith effort at repayment. (*Id.* at 17.)

Appellants contend that this finding was error because the GuBraths acted in bad faith by filing for discharge of their student loans shortly after their repayment period commenced. (*Id.*) Appellants also argue that the payments made by the GuBraths were so minimal that they cannot be considered to constitute good faith. (*Id.* at 20-21.) Finally, Appellants contend that the Bankruptcy Court's alleged failure to consider their payment plans violates public policy. (*Id.*) at 21-22.)

The Court concludes that the Bankruptcy Court properly considered the repayment plans offered by Appellants. The Court found that Appellants have been "sympathetic, cooperative and flexible in offering [the GuBraths] income-based payment plans" but that these were only a "short-term answer" and, because such payment plans did not even come close to covering the interest on the loans, "the debt load simply

grows more burdensome as time passes." (Bankr. Docket No. 129 at 7.) This complies with the law in this circuit, which emphasizes that the focus is not on whether the loan companies have acted in good faith, but on whether the debtors have made good faith efforts to repay. *See Polleys*, 356 F.3d at 1309 ("[T]he good faith portion of the *Brunner* test should consider whether the debtor is acting in good faith in seeking the discharge, or whether he is intentionally creating his hardship.").

After reviewing the record, the Court finds significant support for the Bankruptcy Court's finding that the GuBraths made good faith efforts to repay the loans. Chad GuBrath testified that he completed the necessary paperwork to obtain income-based repayment for the loans held by Appellants, and made periodic payments in accordance with these plans. However, he also testified that a number of his other loans were not eligible for such payment plans, and that he was getting calls from collectors on these other loans. (ECF No. 17 at 129.) When he learned this news, he realized that making payments on all of his loans would be impossible, and sought discharge of all of his student loan debt. (*Id.* at 129-30.) The Court concludes that this record evidence is sufficient to sustain the Bankruptcy Court's finding that the GuBraths made good faith efforts to repay their loans.

In sum, the Court concludes that the Bankruptcy Court's findings with respect to the three prongs of the *Brunner* test were not clearly erroneous. Moreover, considering *de novo* whether these findings were sufficient to constitute "undue hardship" for purposes of Section 523(a)(8), the Court concludes that the Bankruptcy Court correctly discharged the GuBrath's student loans. Given the Tenth Circuit's emphasis on discharging the student loans of those "debtors who truly cannot afford to repay their

loans," and the evidence submitted showing the GuBraths' long-term medical situation, personal care needs, and financial situation, the Court concludes that discharging their student loans advances the Bankruptcy Code's "fresh start" policy. *Polleys*, 356 F.3d at 1309.

## IV.  CONCLUSION

For the reasons set forth above, the Bankruptcy Court's March 10, 2014 Order discharging the student loan debts of Debtors Chad and Nicole GuBrath is AFFIRMED.

Dated this 10th day of December, 2014.

BY THE COURT:

_____
William J. Martinez
United States District Judge